case number 2541. Mr. Randolph. Good morning, your honors, and may it please the court. I've reserved three minutes for rebuttal. Yes. At a minimum, this court should vacate Manaf's convictions under section 960A because the district court failed to instruct the jury on an essential jurisdictional element of those offenses. That failure resulted in a fundamental violation of Manaf's Sixth Amendment right to a jury trial. The government argues that Manaf was not prejudiced by the error, but the government ignores the correct prejudice standard. This court must reverse unless it can conclude that the jury, if properly instructed, have reached the same verdict beyond a reasonable doubt. There was a stipulation in the record, 178-797, I think, that makes it clear that Mr. Manaf was brought into the Westchester County Airport within the Southern District of New York, and that seems to dispose of the jurisdictional issue. I mean, once there's a stipulation of that sort that's clear and unequivocal, how can you argue that that somehow affected his substantial rights? There's no way that the jury could have determined otherwise with respect to the jurisdictional element. So, your honor, our view is that this court needs to read B-5 in a way that is consistent with its precedents. It also cannot read the terms in B-5 in isolation. It has to read the terms in the context of the statute. What was the purpose of the stipulation? The stipulation was for purposes of venue, to establish venue, and there was a jury instruction as to venue. The jury found venue by a preponderance of the evidence, but there was no evidence that was consciously introduced to establish the jurisdictional elements, and I think as to B-5, it's critical for this court to read B-5 in a way that is consistent. Why, with respect to the stipulation, would you use the specific term brought into which tracks the language of 968B-5? Your honor, I can't speak to exactly why the stipulation was drafted with that particular language, but I do think it's... What other reason would there be? Because that's not necessarily a venue-related... That's not language that attaches to a determination as to venue, but it tracks the language of B-5. I believe it would have just been offered to explain to the jury the context for how Mr. Manoff ended up in the United States, but ultimately this turns on an interpretation of the statute, and to interpret the statute, B-5, this court has to keep in mind the context. If this court accepts the government's reading of B-5, then all of the jurisdictional provision, all of section 960AB is surplusage because there is jurisdiction every single time the government brings a prosecution under 960A because... Sorry, have the defendants not found in or brought into the United States? Well, then there would be no trial, your honor. Well, there would be no trial, but it doesn't mean there would be no prosecution, right? There can't be charges lodged. What you're saying is a practical matter, no trial would proceed unless there were in absentia, which happens. Well, in absentia trials, that doesn't help the government either, your honor, on the surplusage issue because the United States, the U.S. Supreme Court has made clear that in absentia trials only happen after the defendant has been present in the United States for the start of trial. What does it mean then? What does B-5 mean if not what it looks like it means? This court has to read B-5 in a way that's consistent with Archer and with Wallace, and the government tries to argue... But tell me what you... Tell us how to read it. Yes. Not just how, not why or which cases, but tell me if you were to say to me, Judge, this is what B-5 means, just tell me what it means. Yes, your honor. So it means that the defendant is brought into or found in the United States, but only in a circumstance where the defendant has taken affirmative voluntary steps to implicate the Federal jurisdictional element. So a couple of scenarios where that would apply. First, a slight adjustment to the facts in this case. In this case, Special Agent Rahi enticed the defendant to fly to Estonia through the defendant's voluntary actions. If instead, the Special Agent had enticed him to come to the United States, then B-5 would apply. Then how does brought into come into play? That makes sense to me if he is found... He comes to the United States. How can you be brought into with the intent of furthering the offense? Sure. I think brought could apply either in a voluntary context or an involuntary context. So in a voluntary context, Manoff, for example, had an escort on the plane. It was an undercover. I think it would fall within the plain meaning of the statute to say that he was brought in a voluntary context because he still took affirmative voluntary steps to get onto that plane and come to Estonia. If he had done the same thing to come to the United States, that would have fallen within the terms of brought. Another scenario where it would apply would be an involuntary scenario where Manoff or another defendant was drug trafficked into the United States. That would be a third party bringing a defendant into the United States without any involvement of the U.S. and therefore jurisdiction would be established under B-5. Those are both very plausible scenarios where B-5 would apply and it addresses the problem. I do want to just emphasize and urge the Court to look at Wallace, specifically Wallace at 1066. We rely primarily on Archer, but Wallace discusses Archer. Yes, Your Honor. Archer is 1952, is that right? It's not a 960A case. That's correct, Your Honor. Archer addressed the Travel Act, but it was based on a broader principle that this Court will read statutes in a way to avoid authorizing the government to unilaterally manufacture jurisdiction. The government tries to narrow Archer and say, oh, it was just about the Travel Act, but that's just an obvious misreading of Archer. Wallace, in particular, makes that clear. Again, if you look at Wallace at 1066, the Court explains that the Archer manufactured jurisdiction principle has been applied by other contexts, for example, to the Hobbs Act. And in Wallace itself, the Court considered whether Archer applied to the bank fraud statute. So this is a principle that goes well beyond any particular statute. It's much like the major questions doctrine. It's an interpretive principle that applies sort of across statutes, and this Court should apply it here. So, look, this resonates with me just as a matter of due process, frankly, and other constitutional concerns with respect to manufactured jurisdiction, although maybe there's a way of looking at this to suggest that Congress had that in mind, but that doesn't necessarily consider the due process concerns. None of this, of course, was argued for obvious reasons, I think, below with respect to the jurisdictional element. And so what we have is plain error, right? Yes, Your Honor. As to a jurisdictional element, and I will ask the question, the government's question about waiver, but how is this plain error unless you can tell me that Archer and Wallace are clearly on point? Well, Your Honor, first of all, we can see the plain error framework applies, but the plain the plainness aspect is made by as a result of the admission. Yes, Your Honor. The plain, the requirement that the error be plain or obvious or clear, so that's prong two of the plain error framework, that applies to whether the instruction should have been given. So whether the jurisdictional element. My question is how do we consider this argument in the context of that, what I think you're arguing is prejudice? Yes, Your Honor. How do we consider that? So the relevant standard with respect to prejudice is beyond a reasonable doubt. This Court has to assure itself beyond a reasonable doubt that the jury would have reached the same verdict if it had been properly instructed. And I'm not aware of any authority saying that this Court has to find that the prejudice, applying that obviousness. But take me, I'm sorry. Sorry, Mr. Reddow. No, no, no, I'm sorry. Take me through the analysis. So the prejudice beyond a reasonable doubt, that's a showing, right? Yes, Your Honor. With respect to this issue of manufactured jurisdiction, how do we assess that? In other words, okay, you've got an argument. The government's got an argument as to why this is not an improper reading of 960AB5, the brought into. And we then assess whether a jury properly instructed, but we don't know exactly what the instruction is. You're telling us that just look at Archer and Wallace. We don't know exactly. We haven't determined that. But a jury properly instructed would have said, no, he was not brought into. Yes, Your Honor. That's what we would have to, that chain of thinking, or line of thinking, is the line of thinking you're inviting us to engage in. But there's room here for the jury to have reached, to have found jurisdiction. So we don't need to convince the Court that the jury necessarily would not have found jurisdiction. For all three of these jurisdictional provisions, it's possible that the jury could have found jurisdiction. But as to the prejudice issue, this is a pure legal issue. This Court should interpret the statute and consider the scope of these provisions as a pure legal issue in resolving the prejudice analysis. Are there not other grounds in 960A besides the brought into B5 ground that the government relies on? The government has relied on three grounds. They lead with the B5 ground, which suggests they think that's their strongest argument. There are two other grounds, B1 and B2. Neither of them work. And I realize I'm over time. I'm happy to explain why they don't work. It's also in our briefing. But I'm happy to answer any questions the Court might have about those two. Explain why those don't work. Sure. So B1 allows for jurisdiction where there is an independent violation of another U.S. criminal law. The government says, oh, well, here there was an independent violation of another U.S. criminal law. It's the importation statute. That's 21 U.S.C. 959, which was the basis for Count 1. That doesn't work because each of the counts here was based on a different set of conduct. There was some overlap across the counts. But Count 1 was based on a much broader set of evidence, including, most notably, the trip to Estonia, where the defendant got on a flight, sat down in person with the undercover, had detailed conversations about future plans to import 500-kilogram shipments of heroin into the United States, and then they shook hands at the end of that meeting. It was extremely compelling evidence. And the government led with that as Exhibit A in support of the importation count, and specifically argued to the jury, and this didn't make it into our briefing, but I'd point the Court to 1125 of the transcript, argued to the jury, you know how obvious and how crushing the evidence is for Count 1, and how he took so many steps as part of his scheme, and he is guilty of this count even before you go into his dealings with the Taliban. So they specifically argued that the jury could convict on Count 1 without even getting to the evidence on Counts 2 and 3. And so there's no way that we can be assured beyond a reasonable doubt that the jury found an intent to import, specifically with respect to the conduct that supported Counts 2 and 3. Count 2 was based on that 10-kilogram shipment within Afghanistan. Count 3 was based on that payment to the Haqqani Network. And there's no way we can be assured beyond a reasonable doubt that the jury would have found intent to import on those counts. So you're saying that the jury couldn't rely on evidence that might largely support one count in connection or two to find that the jurisdictional element had been satisfied with respect to another count? That's not what I'm saying, Your Honor. I'm not saying that. The jury could have relied on this other evidence. But again, the standard is beyond a reasonable doubt. This Court has to assure itself beyond a reasonable doubt that the jury did rely on that particular theory. And sure, it's possible that the jury did think that that 10-kilogram shipment, for example, that there was intent to import into the United States associated with that 10-kilogram shipment. What's odd about this is I think that this came in the context — well, there's both a sufficiency of the evidence challenge and a challenge to the jury instruction. And these seem to be overlapping. Is that fair? There is some overlap, Your Honor, although we would say that they are two independent arguments and this Court should address them separately. We do have — the overlap is to accept that we are challenging the same counts. We have sufficiency challenges to counts two and three. And our instructional error count also goes to two and three. But each claim does require a separate analysis. Well, if the charge had been — the jury instruction had been that — to the jury that you've got to find evidence that the defendant provided or engage in a drug offense in this case for distribution in the U.S. or in New York or wherever in the U.S., would that have been enough? I'm just going to restate to make sure that I understand Your Honor's question. Yes. If the jury had been instructed with respect to count two that it also needed to find an intent to import that 10-kilogram shipment into the United States specifically with respect to that conduct, and that as a result of that, that conduct also violated the importation statute, yes, that would have been sufficient to satisfy the jurisdiction — B-1, which is one of the jurisdictional provisions in this case. Because in connection with determining the adequacy of the jury — and I'm sorry to but I'm not sure that I understand your argument — in connection with assessing the adequacy of the jury instructions, we look at the evidence that was introduced, correct? Yes, Your Honor. You look at the evidence and you ask whether the jury necessarily would have found the same verdict beyond a reasonable doubt if it had been properly instructed. That is the standard. Your Honor, I didn't get a chance to address the commerce element, which is the last ground. I'll give you one minute. One minute? Okay. Very briefly on that. The critical — two critical things. You have to start with what the terms of that provision mean. It's interstate commerce and foreign commerce. We all know interstate commerce refers to commerce between the U.S. states. There's a million U.S. Supreme Court cases that say that. Give or take. Then there's foreign commerce. Foreign commerce also has a settled meaning. It means commerce between two foreign nations. We've cited to this Court's decision in Weingarten, which came to that conclusion with respect to a different federal criminal statute. Courts have also interpreted the foreign commerce clause of the U.S. Constitution the same way. And, of course, that makes sense because the whole point of this provision is to ensure there's a meaningful nexus with the U.S. in the context of 960A. There wouldn't be a meaningful nexus if commerce happened entirely between two foreign nations. And just to close out my minute, that neither of the — sorry, Your Honor — neither of the two counts — the conduct supporting neither count two nor count three is commerce within the meaning of this provision because count two was just the 10-kilogram shipment wholly within Afghanistan, and count three was based on the Haqqani Network transaction, which at most was a transaction between Australia and Afghanistan. There's also evidence in the record that would allow the jury to have found that that was actually wholly within Afghanistan based on evidence with respect to what a Hawala transfer was, which is just — Your two minutes are up. Thank you very much. Thank you so much, Your Honor. Thank you so much. Good morning, Your Honors, and may it please the Court. Haji Abdul-Sattar Abdulmanap was a prolific heroin trafficker who, on his very first phone call with the undercover DEA agent in this case, talked about how desperately, how badly he was looking to find a drug trafficking route into the United States. That was something that he continued to and his intent to import heroin to the United States was something that was beyond — was overwhelmingly established at trial. Let me ask you about that. When it comes to the Haqqani Network count — Yes. 960A, which is a 21, right? So it's — we know that that means it's a drug trafficking offense. 960A says it's a crime to engage in drug trafficking with the intent of benefiting terrorists. That's a simplistic way of saying it, right? Yes, Your Honor. Seems to me that the government's theory of the Haqqani count turns that on its head. And I think what you — the way you just started reinforces that thought in my mind, which is that what the government's theory seems to be is that Mr. Manaf engaged in support of a terrorist entity in order to facilitate drug trafficking, which would turn 960A on its head. How, as to the Haqqani Network, did Mr. — did the evidence show that Mr. Manaf engaged in trafficking with the intent of assisting the Haqqani Network? Well, thank you, Judge Merriam. And I believe there are — there are several points in the record that reinforce this. First, as the government noted, even in its opening statement, but throughout the trial, the whole case was really about the defendant, Manaf, trying to put together and consummate a massive heroin deal that was up to 1,500 kilograms a year. Part of that conduct involved this payment that was made to the Haqqani Network that Manaf facilitated through his Hawala Network. But was the — where's the evidence that the drug trafficking was done with the intent or knowledge of benefiting, as opposed to the vice versa? I understand they're connected. Of course. And one part of that is, in the — in the record, the jury heard the testimony from one of the sources named Fareed Nasiri, who went to the defendant's compound in Kandahar, Afghanistan. While in that meeting, Mr. Nasiri talked about this payment that was going to be made to the Haqqani Network, and mentioned also specifically the names of different people in the Haqqani Network who happened to be high-ranking officials. Manaf's reaction to that was, those are my people, these are my guys. And he talked specifically about how that, without our support, without Manaf's support, these people, the Haqqani Network, would be unable to operate. And where is that? That would be — specifically, Your Honor, the — we made an argument about that on — in the transcript. That's pages 1140 and also 11 — excuse me, 1135 to 1140. That's the testimony, or — That would be the government's argument regarding that, Your Honor. Okay. I can also find a specific site for that in a moment. But the key part of this, Your Honor, was — and also, Manaf said that, in addition, at the close of that meeting, he told Mr. Nasiri that he specifically referenced the undercover and talked about how he was working on a large heroin deal, and that you would be hearing about me more in the future, specifically talking about how — and specifically tying that payment in his mind and his intent to not only help the Haqqani Network, but also as part of this larger drug trafficking operation. Then why did you start today by telling us that what this case was about was Mr. Manaf endeavoring to create a drug trafficking network, that that was Mr. Manaf's goal, and that was repeated time and again? Because I agree that's what the record suggests. Right. What I wanted to emphasize with that, Your Honor, was that this — with — particularly, what you heard from counsel and what counsel also met — referenced in the court below, was that this was a case involving Afghanistan and local conduct that happened purely in Afghanistan. But from the very beginning, this was a case in which Manaf wanted to send heroin to the United States, and that he didn't — Right. And that's the thing that makes your argument responsive to his jurisdictional debate. But it's a double-edged sword, potentially, because although it may solve your problem on jurisdiction, it may not. It certainly responds to it. Again, I think it turns 960A on its head, but I'm happy to let us move on from that. I know my colleagues probably have questions as well. Can I just ask — so, your position is that you had proved an intent to engage in a drug trafficking offense, correct? An attempt. What was — what were the substantial steps in that attempt? So, first, Judge Lanthier, the defendant had made multiple calls, recorded conversations, with the — with the undercover regarding the heroin trafficking that he sought — the heroin that he sought to import into the United States. In addition to that, there was also substantial discussion about a test shipment — a test shipment of heroin, just a small sample, but specifically 10 kilograms — 10 kilograms of heroin that Manaf had registered with the Taliban, that had paid to basically place a stamp or a trademark that Manaf himself created, the stamp was called the Helmand 1. But then how does that connect to the Haqqani Network? Because that's — I'm also trying to understand that connection. Understood. With regard to Count 3, the Haqqani Network specifically, Judge Lanthier, the key points there was that that — those steps were, first, the undercover described how he had this payment of approximately $50,000, or I believe it was $30,000 — $50,000 Australian dollars. Right. For a past — for a past drug transaction. Not just the past transaction, because the undercover was very clear that it was also for what he called zakat, which Dr. Bacon described in her expert testimony as a kind of religious alms that had the added benefit of furthering and maintaining the drug trafficking relationship that Manaf already described how he had at the time of his communications with the undercover. In fact, that was something that the undercover — excuse me, that Manaf described multiple times in his conversations, that he already had a drug trafficking relationship with the Haqqani Network. And, in fact, he also questioned whether they were — whether the undercover sought to pay too much money, saying specifically, don't put them into a bad habit, because they were — he was contemplating the future drug trafficking that they would be engaged in as part of their larger operation that he was seeking to work on. So this payment was not just backward-looking, it was also forward-looking. So, again, it felt that it's more to aid the drug trafficking than necessarily to aid the Haqqani Network. Well, it was to aid the Haqqani Network, Your Honor, because — and there are two reasons for that. First, as you — as the jury heard from Mr. Nassiri's testimony, when he met with the defendant, Manaf, in person at his compound in Kandahar, he described how that money was going to be going to his friends, his guys in the Haqqani Network. And without their support, they would not be sustained. And Dr. Bacon testified in her expert testimony that at that time, in 2018, the Haqqani Network was essentially only engaged in acts of terrorism, in attacks, during the violent insurgency that was happening at that point in time. So your brief says, Manaf agreed to facilitate the transfer — I'm at 45 — the transfer of drug proceeds to the Haqqani Network, demonstrating that his motivation to do so was linked to his desire to carry out additional drug deals. Again, isn't that you saying sort of what my colleague here is asking? What I keep asking is, the goal was the drug dealing. And 960A, I understand — I mean, its purpose, right, is to say, look, if you're going to engage in drug trafficking in order to assist terrorism, we're going to separately criminalize that. We're linking these two things in order to provide an increased penalty for the drug dealing as a result of the benefit to terrorism. But again, your briefing really emphasizes that his goal here was to keep those ties so that he could use the Haqqani Network to ease his drug dealing. I believe that's right. I don't believe that there's necessarily a limitation, Judge Merriam, on this idea that it would be a mutually beneficial relationship. So the concept of that, it's someone who is engaged in drug trafficking under Section 960A, knowing or intending to provide a pecuniary value, pecuniary benefit to an entity or a group that's engaged in terrorist activity. So as I understand it, the argument is that — well, as maybe here the evidence shows, but maybe it doesn't. But as I understand it, all that the government was required to show substantively was a drug offense, knowing that the drug offense somehow provided or in connection with that drug offense, there was a provision of something, a pecuniary value, money, whatever it is, to an organization that the person knows is involved in terrorist activities, period. So it could be 99% a drug offense, but you give something in connection with that drug offense a value to a known terrorist organization. The government's position is that's enough. That's correct. And I see my time has expired, but I'd like to elaborate on that. We had a nice long discussion with your friend on the other side, so go ahead. I appreciate Judge Lohey not getting the hook so early on this, but yes, I very much agree with that view of the statute, that it can be essentially a mutually beneficial relationship. And that was what the evidence showed at trial. And I'll give an example with the Taliban, because Dr. Bacon talked about how essentially — When you say mutually beneficial relationship, the pecuniary value doesn't have to be much at all. So it can be really a very one-sided, I guess maybe then mutual, but mutual in the oddest sense, relationship, correct? Exactly. The statute, and I believe the Mohammed case in the D.C. Circuit was very clear that this was a straightforward statute, and the court should be very reluctant to read additional requirements into it. But at least insofar as the record evidence in this case, it was very clear that Manoff discussed how he would pay the Taliban to assist with the logistics, essentially the marketing, keeping thieves away, helping move under armed escort the heroin. Where is the evidence that he knew that it was involved in forms of terrorism or terrorist activities? Well, first, that was something that he stipulated to at trial. He stipulated that he, at all relevant times, he knew that both the Haqqani network and the Taliban were engaged in terrorist activity. And I believe that is a very critical point for the court to consider here. He also discussed at length his relationship with the — Do you happen to have the citation for that stipulation? Do your honor. One moment, please. Got it. I got it from my colleague.  You're super prepared on the second circuit. Unlike me, your honor. But I — but that — but in particular, at that time, the jury heard testimony that in 2018, it was a particularly dangerous year in Afghanistan because the Taliban was really at the height of its armed insurgency, in which not only was the defendant talking about his relationship with the Taliban and the Haqqani network, but also how, at that time, it occurred against the backdrop of attack — violent attacks by the Taliban and the Haqqani network as they sought to increase their territorial control over coalition forces in the Afghanistan government. With the indulgence of my colleagues, can you turn to this jurisdictional issue? Because I think it's — there are a lot of questions. And you heard from Mr. Randolph that they're largely relying, I think, on Wallace insofar as that informs our reading of Archer. Of course. And first, with regard to the statute itself, because I will touch on Wallace in a moment, but with regard to the statute itself, 960AB contains multiple broad and overlapping jurisdictional predicates. And there's no real mystery to this, because this is largely consistent with many of — with other terrorism statutes that Congress has passed, specifically including the language NB-5. And I believe that reflects congressional intent to extend the extraterritorial jurisdiction of terrorism offenses to the maximum possible extent allowed by law. But there's still this arguably troubling issue of manufactured jurisdiction that we've embraced, notwithstanding statutory provisions that might indicate otherwise. So take me through that. Of course. And first, I'll say this all with a backdrop, that this was not something that was raised below. Of course. This was not — And largely, a lot of this is being raised for the first time on appeal. But with regard to this concept of manufactured jurisdiction, yes, in the concept of the — in the context of the Archer case, in the Travel Act, this Court took issue with the idea of the government essentially federalizing what it described as a local bribery offense by placing a phone call, presumably to take advantage of an interstate wire, in order to then assert federal jurisdiction. From a statutory perspective, that is completely different than what we are dealing with here with regard to an expressly extraterritorial terrorism statute that allows for jurisdiction over multiple individuals, including those who are brought to the United States after the conduct occurs outside the United States. Are there other statutes that use that same language? There are, Your Honor. And I would note a couple of examples of that. First, under 18 U.S.C. Section 2339B — that's a capital B — that's the statute providing material support to foreign terrorist organizations. Subsection D1C of that statute provides for extraterritorial jurisdiction if, after the conduct required for the offense occurs, an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States. The same language we're dealing with here. Same thing, Your Honor, with 18 U.S.C. Section 2339D. That's the statute that prohibits receiving military-type training from a terrorist group. Same thing. Subsection B3 notes that there is jurisdiction if — and it's the exact same quote. In each of these, do you — does the defendant need or does the government need to have proven or demonstrated that the defendant knew that there was a link to the U.S.? From at least a due process perspective, Your Honor. And this is — and to get back to the question about Wallace, and I'll just note here that this Court has been very clear that it's ultimately irrelevant if the federal jurisdictional element is first introduced by a government agent, so long as the defendant subsequently takes a voluntary action that implicates that element. So here, and in this case, while there might be hypotheticals that could raise due process concerns — and this gets back to my very first opening, Judge Merriam, which was that this was a case in which the defendant, for the very first phone call, said, I have — this is great. I'm paraphrasing. I have been after this so much. I've been looking for a route into the United States. How fortuitous is this? And he continued to drive those conversations throughout. That's why he went to Estonia. That's why he shook hands to consummate the deal, as counsel noted. And that's why he sought to ultimately make what he believed to be hundreds of millions of dollars transporting heroin into the United States. So, Mr. Randolph says that the stipulation is really about venue, not about jurisdiction. Is that — what's your response to that? Well, the government specifically cited that stipulation during its closing argument for the purposes of showing that venue was established in this case. But it also — it was not so limited in the sense that it was describing an undisputed fact. Defendant was sitting in court in the United States. He was brought to the United States. And I should just add that the defendant was also — although it's not raised on appeal, he was also convicted of engaging in a, frankly, shocking witness retaliation conspiracy that he orchestrated from the former MCC in New York City. So that all occurs against the backdrop of that stipulation and the fact that the defendant was indisputably brought to the United States and was in the United States for the purposes of B-5. But you agree that there are — that just being brought into the U.S. is not enough? Because I took it from something you said about conjuring different scenarios or hypotheticals, that there might be some situations where that form of jurisdictional hook might violate due process or might raise other constitutional concerns. Is that right? Certainly. And I don't think we need to test the bounds of that jurisdictional element or the due process or any due process concerns here. But there certainly might be hypotheticals in which that due process argument might potentially present itself. But not so here. Not so here because the government's view is that Mr. Manaf actually committed some substantial jurisdictional act to bring drugs into the U.S. and that's enough to fit into the brought into language? That's correct, especially because here he specifically sought to import heroin into the United States. And really that was his — one of his driving forces in engaging in the conduct here. So because of that, there really is no dispute about due process really being implicated here. And we don't really have to worry about which count is the — or provides the — I'm sorry. Which pieces of evidence provide the support for which counts in connection with this jurisdictional issue? I would agree with that, Judge Lohier. I think that otherwise, like, I believe that the court can very much look at the record as a whole and not just simply look at a count-by-count basis as counsel is suggesting. So I see I'm 10 minutes over time. I appreciate the court's indulgence. And unless there's any further questions, the government respectfully asks that the judgment be affirmed. Thank you very much. Thank you, Your Honors. I'd like to just start with the Haqqani Network count and just address some of the issues that came up there. I just want to emphasize how entirely invalid the government's theory was at trial and even now on appeal. At trial, virtually all of the evidence — we think all of the evidence was consistent in establishing that this payment for the Haqqani Network was in return for a past fictitious drug deal. We have all the sites in our briefing, so the court can go and find those. But even if the court thinks that there is sufficient evidence for the government's alternative theory that they developed post-Haq at trial and now on appeal, that this was a payment for a going-forward, sort of ongoing drug-trafficking relationship, that also is not sufficient as a matter of law to support a conviction under 960A for a few reasons. First, this is not a material support charge. This was not a charge based on just a payment to a terrorist organization. They had to prove a specific underlying drug transaction. And the reason why you know that is because the statute required the jury to make a drug quantity finding. So this is not a charge that can be based simply on a generalized payment of support to an organization. You need a specific future drug transaction. And the record shows that can — Isn't there a verdict to that effect? Yes, Your Honor. And what it shows is that the jury — the jury made a drug quantity finding of one kilogram or more. And what that establishes is that the jury convicted based on this fake past drug deal theory. That's what it shows. Because the only evidence in the record that was — that involved a specific drug transaction tied to the Haqqani Network, specific — excuse me — the only evidence — there was no evidence that tied a specific drug transaction to the Haqqani Network. There were only two categories of drug transactions in this record. The first was that 10-kilogram shipment within Afghanistan that was undisputed that that was only related to the Taliban with respect to that stamp. And then the other category of drug transactions was 500-kilogram shipments that went through Taliban territory. And specifically, we just point the court to a few record sites. This is at the transcript. 187 to 190, 195, 251, and 1126. And all of that testimony is getting at future drug shipments involving the Taliban, going through the Taliban's territory. None of the record sites the government's pointed to in their briefing or today suggests that there was any specific future drug transaction related to the Haqqani Network. Certainly nothing that would have allowed the jury to make a drug quantity finding. And I'm sorry. Was the true instruction specific to the Haqqani Network and not related at all to the Taliban? Yes, Your Honor. With respect to count three, it was specific to the Haqqani Network. In fact, the government was required to limit its argument to the jury on that count and specifically because there was a double jeopardy issue. And so the government had to ensure that there was distinct conduct that supported the Haqqani Network count separate from the Taliban count. I'm over my time. I had a few brief points on the jurisdictional issues. Would you just address those jurisdictional issues because I'm looking at Wallace. And there we cited there's a series of cases that Wallace cites too where jurisdiction was held under either the brought into or a form of a brought into statutory language where the defendant himself committed the substantial jurisdictional act. What am I missing? Yes, Your Honor. So what Wallace does is it distinguishes Archer. And it does point to cases where the courts found jurisdiction. But it also cites the cases. If you keep reading in the same passage you're on. I am. And you get there's a footnote there. And it cites the cases where the courts came out the other way. And they applied Archer. And they found there's no jurisdiction. And the difference between one family of the way the court distinguishes one family of the other is that what is by asking whether the defendant engaged in voluntary affirmative steps to implicate the jurisdictional element. And it sounds to me based on the government's argument today. He's talking there's a discussion with an undercover about and maybe it boasts however you want to characterize it about sending narcotics to the U.S. And I think part of the charge is it's intact also. Yes, Your Honor. But this is specific to B-5. Right? So we're advancing a statutory interpretation argument with respect to B-5. And what does it mean to be brought into or found in the United States? And under Archer and Wallace, this court has to read that language in a way that would require at least the defendant to have some sort of affirmative voluntary steps to come to the United States. And so that's what I was getting at with the hypothetical where Manoff, for example, had accepted. That's not what Wallace says. Yes, Your Honor. Respectfully, it is what Wallace says. There was just substantial, for example, acts that jurisdictional act of bringing drugs into the U.S., not myself into the U.S. Well, but what the court in Wallace is very specific about is that it has to implicate the federal element, the federal jurisdictional element. And so what is the element that we're talking about here? It's B-5. We're talking about B-5. And that's what the government is asserting as the basis for its jurisdiction here. And I actually heard the government seem to accept this framing, that this requires some sort of voluntary affirmative steps on behalf of the defendant. And if so, then that's the fact question for the jury. Let the jury be instructed on that particular standard and let the jury make that determination. But there's no way this court can find beyond a reasonable doubt that that's standard. Thank you very, very much. Thank you all so much. We ask that you vacate the judgment. Thank you.